IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | | |
|---|---|---|
| James I. Boyd, | ) | Civil Action No. 6:15-2108-BHH-KFM |
| Plaintiff, | ) | |
| | ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. | ) | |
| | ) | |
| U.S. Federal Bureau of Prisons, | ) | |
| Defendant. | ) | |

This matter is before the court on the defendant's motion to dismiss or, in the alternative, for summary judgment (doc. 20). The plaintiff, a federal inmate currently incarcerated at Federal Correctional Institution ("FCI") Forrest City Low in Forrest City, Arkansas, who is proceeding *pro se*, seeks relief pursuant to the Federal Tort Claims Act.

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B) and Local Civ. Rule 73.02(B)(2)(d) (D.S.C.), all pretrial matters in this case were referred to the undersigned United States Magistrate Judge for consideration.

The defendant filed a motion to dismiss or, in the alternative, for summary judgment on September 28, 2015 (doc. 20). Pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), the plaintiff was advised of the dismissal and summary judgment procedure and the possible consequences if he failed to respond adequately (doc. 21). The plaintiff filed his response in opposition to the motion on January 4, 2016 (doc. 30). The defendant thereafter filed a reply on January 14, 2016 (doc. 32), and the plaintiff filed a sur-reply on February 22, 2016 (doc. 38).

## FACTS PRESENTED

The allegations in the plaintiff's complaint involve the medical treatment of "an acute affliction attacking [his] ocular facilities" while the plaintiff was incarcerated at FCI Estill in Estill, South Carolina, within the Bureau of Prisons ("BOP") (*see* doc. 1). The plaintiff's inmate records reveal that he arrived at FCI Estill on May 3, 2013 (doc. 20-2,

inmate history at 2).  On this same day, the plaintiff had an initial health screen where he indicated he had a past history of rotator cuff injury to his right shoulder in 1992 and had some current pain associated with this injury. The plaintiff did not voice any other complaint or concerns.  He was instructed on how to obtain medical and mental health care during this initial health screen (doc. 20-5, Negron decl. ¶ 5; doc. 20-6, med. rec. at 1-6).

On May 13, 2013, an Advanced Registered Nurse Practitioner ("ARNP"), performed a history and physical on the plaintiff (doc. 20-5, Negron decl. ¶ 6; doc. 20-6, med. rec. at 007-019).   A physical examination revealed the plaintiff had chronic hypertension and hyperlipidemia.  Due to the plaintiff's age, history of hypertension and hyperlipidemia, and his obesity, a consultation request was submitted for the plaintiff to see an optometrist (*id.*; doc. 20-7, cons. requ. at 1-2).  The ARNP noted that the plaintiff needed to be evaluated for any retinopathies and gave him a provisional diagnosis of myopia (nearsightedness) (*id.*).  This consult was listed as "Medically Necessary -- Non-Emergent"[1] since it was not life-threatening and did not require immediate medical care or treatment (*id.*).  On the same date, the plaintiff was seen by the staff physician in regard to his chronic conditions of hypertension and hyperlipidemia, and counseled on compliance and treatment for his chronic conditions (doc. 20-5, Negron decl. ¶ 7; doc. 20-6, med. rec. at 20-21).

On September 11, 2013, the plaintiff was examined by a contract optometrist for a complaint of blurry vision and for eye glasses (doc. 20-5, Negron decl. ¶ 8; doc. 20-9, cons. rep. at 1-2).  During the examination, the optometrist suspected there was a foreign object in the cornea of the plaintiff's right eye, but the plaintiff stated it was not causing him any discomfort except it was scratchy, and it was not noticeable most of the time.  The optometrist prescribed glasses for the plaintiff, erythromycin ophthalmic ointment, and

---

[1]    Program Statement 6031.04(7)(b), Patient Care, defines "Medically Necessary—Non-Emergent" as "any medical conditions that are not immediately life-threatening but which without care the inmate could not be maintained without significant risk of: [s]erious deterioration leading to premature death; [s]ignificant pain or discomfort which impairs the inmate's participation in activities of daily living" (doc. 20-8, Prog. Statement 6031.4(7)(b) at 6).

indicated he would remove the foreign body from the plaintiff's right eye during his next visit. The plaintiff was diagnosed with myopia and astigmatism (*id*.).

On September 23, 2013, the staff physician entered a clinical encounter-administrative note in the plaintiff's medical file indicating that the plaintiff was seen by the optometrist on September 11, 2013, who recommended a plan of care and to see the plaintiff again in two to three weeks (doc. 20-5, Negron decl. ¶ 9; doc. 20-6, med. rec. at 28). A new consultation request was submitted at that time for the plaintiff to see the optometrist. On the consultation request, the physician listed the request as "Medically Necessary-Acute or Emergent"[2] (doc. 20-5, Negron decl. ¶ 9; doc. 20-7, cons. requ. at 3-4).

On November 25, 2013, the staff physician evaluated the plaintiff who indicated he was still having trouble with irritation in his right eye and was pending a visit with the optometrist (doc. 20-5, Negron decl. ¶ 10; doc. 20-6, med. rec. at 29). The staff physician renewed the plaintiff's eye drops and assessed him with conjunctivitis (*id*.; doc. 20-10, med. summ. at 4).

On November 27, 2013, the plaintiff was seen by the contract optometrist, who removed the foreign body from his right eye that was entrapped in pterygium[3] (doc. 20-5, Negron decl. ¶ 11; doc. 20-9, cons. rep. at 3). The optometrist also recommended that the plaintiff continue to use the erythromycin for two weeks and that a month follow-up appointment be scheduled (*id*.). The staff physician submitted a consultation request for

---

[2] Policy defines "Medical Necessary—Acute or Emergent" as "[m]edical conditions that are of an immediate acute or emergent nature, which without care would cause rapid deterioration of the inmate's health, significant irreversible loss of function, or may be life-threatening." (doc. 20-8 , Prog. Statement 6031.4(7)(b) at 5).

[3] Pterygium (Surfer's eye) most often refers to a benign growth of the conjunctiva (doc. 20-5, Negron decl. ¶ 11). Today, a variety of options are available for the management of pterygium, from irradiation, to conjunctival auto-grafting or amniotic membrane transplantation, along with glue and suture application. As it is a benign growth, pterygium typically does not require surgery unless it grows to such an extent that it covers the pupil, obstructing vision, or presents with acute symptoms (*id*.). Some of the irritating symptoms can be addressed with artificial tears. No reliable medical treatment exists to reduce or prevent pterygium progression. Definitive treatment is achieved only through surgical removal. Long-term follow-up is required as pterygium may recur (*id*.).

a follow-up appointment for the plaintiff to see the optometrist in a month (doc. 20-5, Negron decl. ¶ 12; doc. 20-6, med.rec. at 30; doc. 20-7, cons. requ. at 5-6). On December 10, 2013, the same staff physician noted in the plaintiff's medical record, that the plaintiff was seen by the optometrist on November 27, 2013, and he needed a follow up in a month (doc. 20-5, Negron decl. ¶ 13; doc. 20-6, med. rec. at 31).

On December 16, 2013, the plaintiff was seen by the ARNP during sick call with complaints of continual right eye discomfort, photosensitivity, and diffuse redness (doc. 20-5, Negron decl. ¶ 14; doc. 20-6, med. rec. at 32-35). His pain was noted as three on a ten point pain management scale. An examination revealed decompensated visual acuity; thus, a consultation request was initiated for the plaintiff to be examined by an ophthalmologist emergently. He was diagnosed with cornea disorder/conjunctivitis. The plaintiff was given instruction to continue with the current medication regimen, not to read, not to strain his eye, and to avoid direct light. The ARNP counseled the plaintiff on how to access medical care, and the plaintiff acknowledged that he understood (*id*.). On that same date, a consultation request was submitted for the plaintiff to see an ophthalmologist (doc. 20-5, Negron decl. ¶ 14; doc. 20-7, cons. requ. at 7-8). The request was listed as "Medically Necessary-Acute or Emergent" (*id*.). The plaintiff was transported to his appointment with the ophthalmologist on December 20, 2013 (doc. 20-5, Negron decl. ¶ 15; doc. 20-9, cons. rep. at 4-8). An examination revealed a conjuctivial neoplasm/mass and dellen with extreme thinning of the peripheral cornea in the right eye. The ophthalmologist prescribed the plaintiff Durezol with the hope of quieting down and shrinking the mass. It was also recommended the plaintiff be seen within one week by a corneal specialist. The plaintiff was instructed to lubricate his right eye with preservative free eye drops and not to engage in anything that would cause trauma to his right eye until he was seen by a corneal specialist. Upon his return from the ophthalmologist, medical staff at FCI Estill saw the plaintiff (*id*.). He was given a prescription of eye drops and a request to see a corneal specialist. (doc. 20-5, Negron decl. ¶ 16; doc. 20-6, med. rec. at 36-39).

4

On December 23, 2013, the staff physician made an administrative note indicating that the plaintiff needed to see the corneal specialist to evaluate and manage irritable mass on right cornea. The physician also prescribed new eye drop medication (doc. 20-5, Negron decl. ¶ 17; doc. 20-6, medical rec. at 40-42; doc. 20-10, med. summ. at 1-3). At that time, the physician also submitted a new consultation request for the plaintiff to see the corneal specialist (doc. 20-5, Negron decl. ¶ 17; doc. 20-7, cons. requ. at 9-10). He listed the consultation request as "Medically Necessary—Acute or Emergent" (*id*.). The plaintiff was also seen on December 23, 2013, by the ARNP regarding his chronic hypertension and hyperlipidemia (doc. 20-5, Negron decl. ¶ 18; doc. 20-6, med. rec. at 43-48). At this appointment, the plaintiff thanked the ARNP for getting him seen by the eye doctor, and he was shocked he got out so soon. He said his eye was not as red, he had no discomfort , and he felt much better. Examination of the plaintiff's's eye showed that, compared to the previous assessments, the redness had reduced tremendously. The ARNP noted that the consultation request of the corneal specialist was pending, and the plaintiff was instructed not to use both drops. The ARNP counseled him on access to care, and the plaintiff said he understood (*id*.).

On December 31, 2013, the plaintiff was transported to the Medical University of South Carolina ("MUSC"), Storm Eye Institute, for an appointment with a corneal specialist (doc. 20-5, Negron decl ¶ 19; doc. 20-9, cons. rep. at 9-10). After performing an examination, the corneal specialist suspected the plaintiff was suffering from Peripheral Ulcerative Keratitis ("PUK")[4] of unknown etiology (*id*.). The corneal specialist recommended lab testing to rule out Hepatitis, HIV, Lyme Disease, and arthritis as the cause of the plaintiff's condition. The plaintiff was instructed to wear an eye shield and continue with prescribed medications (*id*.).

---

[4] PUK is a potentially devastating disorder consisting of a crescent-shaped destructive inflammation at the margin of corneal stroma that is associated with an epithelial defect, presence of stromal inflammatory cells, and progressive stromal degradation and thinning (doc. 20-11, Peripheral Ulcerative Keratitis, Medscape Reference). It can quickly produce progressive necrosis of the corneal stroma, leading to perforation and blindness. PUK is uncommon (*id*.).

On January 6, 2014, the plaintiff sent an email to Health Services stating that as of one day prior his eye became red and painful. He stated that the pain and redness coincided with the completion of medication received from the Storm Eye Institute and the start of the medication prescribed to replace it by the institution's pharmacy (doc. 30-1 at 2).

On January 9, 2014, the plaintiff was seen for a follow-up examination in the Health Services Department at FCI Estill (doc. 20-5, Negron decl. ¶ 20; doc. 20-6, med. rec. at 49-53). The plaintiff complained he ran out of eye drops and his eye was hurting again; he indicated his pain was a three out of ten. He was assessed with corneal disorder, two of his eye medications were renewed, he was prescribed one new eye medication, and blood work was ordered. Medical staff also requested a consultation for the plaintiff to see the ophthalmologist (*id*.; doc. 20-7, cons. requ. at 11-12). He was continued on a work furlough and was reminded to wear the eye patch as instructed. (doc. 20-5, Negron decl. ¶ 20; doc. 20-6, med. rec. at 49-53]. The plaintiff was also counseled on access to care, and said he understood (*id*.). On January 13, 2014, the plaintiff's prescriptions were filled (doc. 20-5, Negron decl. ¶ 21; doc. 20-10, med. summ. at 1-4).

Also on January 9th, the plaintiff sent another email to Health Services. He noted that he had stopped taking the new prescription and was relying on natural tears to keep his eyes moist. The swelling, redness, and sensitivity to light had eased. He further noted that he had spoken with ARNP Middleton, "and as always she was helpful, but she also explained that the orders and directions from the Storm Institute were not in the chart at that time" (doc. 30-1 at 3).

On January 14, 2014, the plaintiff's blood was drawn for laboratory testing. (doc. 20-5, Negron decl ¶ 22; doc. 20-12, lab test results at 1-2).

In an email to Health Services on February 1, 2014, the plaintiff stated that his symptoms continued and his pain had increased. He requested a refill of steroid drops and noted that the corneal specialist had wanted to see him again within three weeks of the December 31, 2013, visit (doc. 30-1 at 4).

On February 5, 2014, the plaintiff was seen again in the Health Services Department for a follow-up appointment (doc. 20-5, Negron decl. ¶ 23; doc. 20-6, med. rec. at 54-56). He stated he was low on his eye medication but was not in any pain. He was examined and assessed with conjunctivitis (*id*.). The plaintiff was counseled on compliance with treatment for his condition and encouraged to use the medication as instructed. The plaintiff acknowledged that he understood (*id*.). His medications for his eyes were renewed (*id*.; doc. 20-10, med. summ. at 1, 3).

On February 14, 2014, the plaintiff sent an email to Health Services expressing his frustration with cancelled and rescheduled appointments with the optometrist as well as prescriptions for medications that were changed on three occasions by three doctors. The plaintiff complained that nothing had helped his eye issue and it was getting progressively worse. He stated, "I have little doubt that I am at risk to losing my eyesight, and the individuals who specialize in this area of medicine concurred and provided a course of action that has thus far been ignored. Can we PLEASE address this issue" (doc. 30-1 at 6).

On February 20, 2014, blood was drawn on the plaintiff for laboratory testing (doc. 20-5, Negron decl. ¶ 24; doc. 20-12, lab test results at 3-4).

On February 25, 2014, the plaintiff was transported to a follow-up appointment with the corneal specialist (doc. 20-5, Negron decl. ¶ 25; doc. 20-9, cons. rep. at 11-16). He was assessed with PUK (*id*.). The specialist provided instruction for the plaintiff to discontinue fluorometholone and start Durezol, three times a day; use artificial tears every hour; stop Motrin; start Aleve; consult rheumatology; wear eye shield for sleeping; and return for a follow-up (*id*.). Upon return to the institution, the plaintiff was seen by medical staff and was not complaining of pain (doc. 20-5, Negron decl. ¶ 26; doc. 20-6, med. rec. at 57-60).

On March 4, 2014, the staff physician noted in the plaintiff's medical records that the plaintiff had been seen by the corneal specialist on February 25, 2014, and has a follow-up appointment on March 19, 2014 (doc. 20-5, Negron decl. ¶ 27; doc. 20-6, med.

7

rec. at 61-62).    The physician submitted a consult requesting confirmation of the appointment for the plaintiff (*id*.; doc. 20-7, cons. requ. at 13-14).

On March 5, 2014, the staff physician made a note in the plaintiff's record prescribing a new eye medication, discontinuing one of his prior eye medications, and prescribing him Naprosyn for eye discomfort (doc. 20-5, Negron decl. ¶ 28; doc. 20-6, med. rec. at 63-64; doc. 20-10, med. summ. at 2-3).

The plaintiff saw the contract optometrist on March 12, 2014 (doc. 20-5, Negron decl ¶ 29.; doc. 20-9, cons. rep. at 17).    The optometrist noted the plaintiff had corneal thinning at the limbus of his right eye from an unknown cause and advised him to continue with instructions given by the corneal specialist (*id*.).

The staff physician made an administrative note in the plaintiff's medical record on March 20, 2014, indicating the plaintiff was seen by the optometrist on March 12, 2014, and a care plan was implemented (doc. 20-5, Negron decl. ¶ 30; doc. 20-6, med. rec. at 65).    He also submitted a consultation request for the plaintiff to see the optometrist again in 12 months since he was currently being seen by a specialist from MUSC (doc. 20-5, Negron decl. ¶ 30; doc. 20-7, cons. requ. at 15-16).

On April 7, 2014, the plaintiff was seen in sick call, asking for a refill on his eye medications and when he was going to see the specialist again (doc. 20-5, Negron decl. ¶ 31; doc. 20-6, med. rec. at 65-69).    Medical staff noted his appointment with the corneal specialist was scheduled and renewed his eye medications (*id*.; doc. 20-10, med. summ. at 3-4).

The plaintiff was transported to MUSC for his appointment with the corneal specialist on April 9, 2014 (doc. 20-5, Negron decl. ¶ 32; doc. 20-9, cons. rep. at 18-20). At this visit, the specialist recommended that the plaintiff see a rheumatologist as soon as possible, as he was at risk for loss of his right eye and other issues with systemic disease. The specialist also recommended that the plaintiff follow-up with him in four to six weeks (*id*.).    Upon the plaintiff's return to Estill, he was seen by medical staff, who noted the specialist's recommendations (doc. 20-5, Negron decl. ¶ 33; doc. 20-6, med. rec. at 70-72).

8

Later that same day, the staff physician noted that the plaintiff already had two scheduled follow-up appointments with the corneal specialist for April 22, 2014, and May 13, 2014 (doc. 20-5, Negron decl. ¶ 34; doc. 20-6, med. rec. at 73). He added a new consultation request for the plaintiff to see a rheumatologist (*id*.). The staff physician also submitted three consultation requests for the plaintiff to see the corneal specialist and rheumatologist (doc. 20-5, Negron decl. ¶ 34; doc. 20-7, cons. requ. at 17-22).

On Friday, April 25, 2014, the plaintiff sent an email to Health Services noting that he had been told that despite the fact that the pass for the protective covering to protect his eyes had been extended to April 2015, he was told that he could not wear the eye protection until he went to sick call to have the pass rewritten by the physician. As sick call was not until Monday, the plaintiff had to go without the covering for several days (doc. 30-1 at 7).

On April 30, 2014, the plaintiff was transported to MUSC for a rheumatology appointment (doc. 20-5, Negron decl. ¶ 35; doc. 20-9, cons. rep. at 21-27). The rheumatologist indicated the etiology for the plaintiff's PUK was unclear and could have been caused by an infection or associated autoimmune disease. He recommended lab testing to investigate for possible rheumatic diseases that are known to be associated with PUK such as rheumatoid arthritis, lupus, sarcoidosis, vasculitis, relapsing polychondritis, or systemic lupus erythematosus (*id*.). The plaintiff was seen by medical staff upon his return to Estill (doc. 20-5, Negron decl. ¶ 36; doc. 20-6, med. rec. at 74-78). Staff assessment of the plaintiff indicated he appeared well, had eaten, and taken his daily medications before coming to Health Services (*id*.)

The plaintiff told staff that the rheumatologist wanted to order a lot of tests so they could rule things out and hopefully find a diagnosis (*id*.). Medical staff ordered the recommended labs and chest x-rays and submitted a follow-up evaluation request with the rheumatologist (*id*.; doc. 20-7, cons. requ. at 23-24). The plaintiff was counseled on the plan of care and he stated he understood (doc. 20-5, Negron decl. ¶ 36; doc. 20-6, med. rec. at 74-78).

9

On May 6, 2014, blood was taken from the plaintiff for lab testing. The results were sent to medical staff at Estill on May 8, 2014 (doc. 20-5, Negron decl. ¶ 37; doc. 20-12, lab test results at 5-8).

On May 13, 2014, the plaintiff was transported to a follow-up appointment with the corneal specialist (doc. 20-5, Negron decl. ¶ 38; doc. 20-9, cons. rep. at 28-29). The specialist noted that the plaintiff's prescription for Durezol[5] was changed to Pred Forte. The specialist recommended that the plaintiff continue at his current dose (*id*.).

The plaintiff's eye medications were renewed by medical staff on May 27, 2014 (doc. 20-5, Negron decl. ¶ 39; doc. 20-6, med. rec. at 79-82; doc. 20-10, med. summ. at 7-8).

On July 2, 2014, the plaintiff was transported to a follow-up appointment with the rheumatologist, but the appointment was cancelled because of late arrival and the lab test results had not been received yet (doc. 20-5, Negron decl. ¶ 40; doc. 20-6, med. rec. at 83). The appointment was rescheduled, and the lab results were faxed to the specialist (*id*.)

On July 6, 2014, the plaintiff sent an email to staff stating that the institution had been sending him to several specialists over the last six months, "but unfortunately despite the improved approach and the access to proper doctors, there seems to be some kind of disconnect between the various organs responsible for my care." He stated, "[T]he destruction of my Cornea and whatever underlying cause for it began in Sept. of last year, in that time due to Medicals (administration & records department) continued disconnect from the process for whatever the reason, I am unable to obtain a solution to this problem . . . " The plaintiff requested that staff intercede and "find a way to put all parties on the same page" (doc. 30-1 at 8).

---

[5] Durezol is a non-formulary medication that requires approval by the Central Office (doc. 20-5, Negron dec. ¶ 38). Although the ophthalmologist originally provided Durezol to the plaintiff on December 20, 2013, medical staff at FCI Estill could not prescribe it until approved by the Central Office (*id*.). In the interim, the plaintiff was prescribed an appropriate substitute medication (*id*.).

On July 11, 2014, the plaintiff sent an email to Health Services requesting that he be able to see his medical records from February 22, 2014, until the present (doc. 30-1 at 10).

On July 24, 2014, the plaintiff signed up for sick call, asking when he was going to be rescheduled to see the rheumatologist (doc. 20-5, Negron decl. ¶ 41; doc. 20-6, med. rec. at 84-85).  Medical staff advised him he was pending scheduling to see the rheumatologist and the corneal specialist.  The plaintiff stated everything was good (*id*.).

On July 25, 2014, the plaintiff signed up for sick call requesting one of his eye medications be renewed (doc. 20-5, Negron decl. ¶ 42; doc. 20-6, med. rec. at 86-88). Medical staff noted his chart would have to be reviewed to see if he needed a refill, and, at that time, no physician or mid-level practitioner was available (*id*.). It was also noted that the medical records system ("BEMR") will not allow a mid-level provider ("MLP") to co-sign the order when this medication was ordered (*id*.).  On July 30, 2014, medical staff renewed the plaintiff's eye medication (doc. 20-5, Negron decl. ¶ 43; doc. 20-6, med. rec. at 89-90; doc. 20-10, med. summ. at 7).

The plaintiff was seen by the rheumatologist on August 7, 2014, who reviewed the prior lab results and assessed him with PUK (doc. 20-5, Negron decl. ¶ 44; doc. 20-9, cons. rep. at 30-35).  The specialist recommended additional blood work and a follow-up appointment (*id*.).

On August 7, 2014, upon returning from seeing the rheumatologist, the plaintiff was seen by institution medical staff where he indicated he was not in any pain (doc. 32-2, Aug. med. encounters at 1-2).

On August 10, 2014, a consultation request for the plaintiff to see the rheumatologist was submitted (doc. 20-5, Negron decl. ¶ 46; doc. 20-7, cons. requ. at 25-27).  The rheumatologist's consult report was reviewed by Dr. Ivan L. Negron, the Regional Medical Director for the BOP at the Southeast Regional Office, who at all times relevant to the plaintiff's allegations was also Acting Clinical Director for FCI Estill (doc. 32-2, Aug. med. encounters at 3).  New laboratory tests were ordered (*id.*).

11

On August 14, 2014, more pain medication was prescribed to the plaintiff, and a consultation request for the plaintiff to see the ophthalmologist was submitted (doc. 32-2, Aug. med. encounters at 4).

On August 21, 2014, the plaintiff sent an email to staff expressing his frustration with the medical care he was receiving and noting that his eye problem was only getting worse. He noted that he had seen "numerous doctors sporadically" but there had been no consistency in his treatment (doc. 30-1 at 11).

Also on August 21, 2014, a consultation request was submitted for the plaintiff to see the corneal specialist for an evaluation to determine if a corneal desquamation (peeling of the layers of the cornea) was necessary, as previously recommended (doc. 20-5, Negron decl. ¶ 46; doc. 20-7, cons. requ. at 28-30).

On August 25, 2014, upon the plaintiff's request, 71 pages of Bureau Electronic Medical Records ("BEMR") records were released to him (doc 32-2, Aug. med. encounters at 5). On this same day, the plaintiff was seen for sick call complaining of eye pain (*id.* at 6-8). He indicated his pain was a seven on the pain management scale. At that time, he was prescribed more Tylenol with codeine for his pain and was reminded he had an upcoming appointment with the ophthalmologist. He was counseled on how to access future care and verbalized he understood (*id.*).

The plaintiff saw the ophthalmologist on August 28, 2014, who renewed his eye medications (doc. 20-5, Negron decl. ¶ 47; doc. 20-9, cons. rep. at 36-43). The specialist noted the plaintiff's next appointment at the Storm Eye Institute was scheduled for September 3, 2014 (*id.*). Medical staff submitted a consultation request for this follow-up appointment (doc. 20-5, Negron decl. ¶ 48; doc. 20-7, cons. requ. at 31-33). The plaintiff was seen by medical staff upon his return (doc. 32-2, Aug. med. encounters at 10-13). At that time, he indicated he was doing well, and he had his right eye covered. The medications recommended by the ophthalmologist were prescribed, and his other medications were reconciled (*id.*).

12

On September 3, 2014, the plaintiff was seen by the corneal specialist for a follow-up examination (doc. 20-5, Negron decl. ¶ 49; doc. 20-9, cons. rep. at 44-56). At this appointment, the plaintiff indicated his right eye was worse, was hurting, and he could not expose it to light. He also stated he had tightness and pressure above his right eye, he was nauseous, and had a headache. The specialist noted that the plaintiff had seen the rheumatologist and the lab results up until that time were negative. The x-rays ordered were also negative (id.). He assessed the plaintiff with PUK caused by a Mooren's ulcer ("MU")[6] in his right eye (doc. 20-5, Negron decl. ¶ 49; doc. 20-9, cons. rep. at 54). The specialist recommended a surgical recession of the conjunctiva and cryotherapy, and probable lamellar or a full thickness corneal graft. He indicated the surgery was scheduled for September 8, 2014. The recommended plan of care at that time for the plaintiff was to continue aggressive lubrication to help in diluting inflammatory cytokines, continue use of the doxycycline drops, continue taking oral prednisone, and continue wearing an eye shield at all times. He also noted that he discussed at length with the plaintiff the high risk of perforation and graft melt. The specialist prescribed the plaintiff two new eye drops (id.).

Upon the plaintiff's return to the institution, he was seen by medical staff (doc. 20-5, Negron decl. ¶ 50; doc. 20-6, med. rec. at 91-93). At that time, he did not voice any complaints and was not in acute distress. Medical staff reviewed the two new eye medications recommended by the specialist. The plaintiff was counseled on how to access care, and he verbalized he understood (id.). The consultation request for surgery on September 8, 2014, was submitted (doc. 20-5, Negron decl. ¶ 51; doc. 20-7, cons. requ. at 34-36).

---

[6] Mooren's ulcer is a rare local autoimmune disease associated with PUK (doc. 20-11, PUK, Medscape Reference). It is a painful, relentless, chronic ulcerative keratitis that begins peripherally and progresses circumferentially and centrally (doc. 20-13, Mooren's Ulcer: Diagnosis and Management). It is idiopathic, occurring in the complete absence of any diagnosable systematic disorder that could be responsible for the progressive destruction of the cornea (id.). Thus, MU is a PUK with no associated scleritis (id.).

The surgery request was approved on September 4, 2014,[7] by Dr. Negron, (doc. 20-5, Negron decl. ¶ 52; doc. 20-7, cons. requ. at 36). Dr. Negron also prescribed the two new medications recommended by the ophthalmologist (doc. 20-5, Negron decl. ¶ 52; doc. 20-6, med. rec. at 96; doc. 20-10, med. summ. at 6-7).

On September 8, 2014, the plaintiff was taken to MUSC for surgery on his right eye (doc. 20-5, Negron decl. ¶ 53; doc. 20-9, cons. rep. at 57-64). The procedure went as planned with no complications. After surgery, the plaintiff complained of a throbbing, prickly sensation. Post-operative instructions given by the corneal specialist included using prescription eye drops, wearing the eye patch/shield at all times, taking pain medication as needed, and returning the next day for a post-operative follow-up (*id.*). Upon his return to Estill, the plaintiff was seen in Health Services, where he complained of significant pain in his right eye; he stated his pain was eight out of ten (doc. 20-5, Negron decl. ¶ 54; doc. 20-6, med. rec. at 98-101). The plaintiff was given pain medication and prescribed eye medications. Medical staff requested approval from the Central Office for the other medication that was not on the National Formulary list (doc. 20-5, Negron decl. ¶ 54; doc. 20-10, med. summ. at 5, 7).

On the morning of September 9, 2014, medical staff noted in the plaintiff's medical record that the plaintiff had a surgical procedure the previous day on his right eye and he was evaluated by the evening nurse upon his return to the institution (doc. 20-5, Negron decl. ¶ 55; doc. 20-6, med. rec. at 102-103). Medical staff also prescribed the plaintiff additional prescription eye medications and renewed his other medications (*id.*; doc. 20-10, med. summ. at 7-8).

On September 9, 2014, the plaintiff was transported to MUSC for his follow-up with the corneal specialist (doc. 20-5, Negron decl. ¶ 56; doc. 20-9, cons. rep. at 65-69). An examination revealed no signs of an infection in the operative right eye. The same

---

[7]The date of 2015 in Dr. Negron's declaration is apparently a typographical error based on the other documentation of record (*compare* doc. 20-5, Negron decl. ¶ 52 *with* doc. 20-7, cons. requ. at 36).

post-operative instructions were repeated (*id*.).  The plaintiff returned to Estill where he was seen by medical staff (doc. 20-5, Negron decl. ¶ 57; doc. 20-6, med. rec. at 104-106).  At this time, his pain was at a five, and he asked for pain medication since he missed morning pill line while at his follow-up appointment.  Medical staff noted the plaintiff appeared well, his right eye was covered with a clear shield, the sclera of the plaintiff's right eye was red, which was expected post-op, and there was no drainage noted from the eye (*id*.).  The plaintiff was given pain medication, instructed to follow-up in 12 to 24 hours, and counseled on his new medications (doc. 20-5, Negron decl. ¶ 57; doc. 20-10, med. summ. at 7-8). The plaintiff stated that he understood (*id*.).

Medical records do not show that the plaintiff returned to the Medical Department until after his September 25, 2014, follow-up evaluation with the corneal specialist (doc. 20-5, Negron decl. ¶ 58; doc. 20-6, med. rec. at 107-108).

The plaintiff was transported to MUSC on September 25, 2014, to see the corneal specialist (doc. 20-5, Negron decl. ¶ 59; doc. 20-9, cons. rep. at 70-75).  At this appointment, the plaintiff indicated his "pain is down exponentially."  The corneal specialist confirmed the plaintiff's earlier diagnoses of MU in his right eye.  The corneal specialist recommended the plaintiff continue on all medications and return in one to two weeks (*id*.)

On September 26, 2014, Dr. Negron noted in the plaintiff's medical record that he reviewed the post-operative follow-up consult report (doc. 20-5, Negron decl. ¶ 60; doc. 20-6, med. rec. at 107-108).  A consultation request was made at that time for the follow-up (*id*.; doc. 20-7, cons. requ. at 37-38).  Also, on September 26, 2014, the plaintiff was seen by medical staff for a follow-up evaluation. (doc. 20-5, Negron decl. ¶ 61; doc. 20-6, med. rec. at 109-110).  The plaintiff had no complaints and was not in any pain. Examination revealed some degree of lessening erythema to the plaintiff's right sclera, and generally the plaintiff's condition had improved.  The plaintiff reported a resolution in discomfort in his right eye.  Medical staff noted that the plan of care in regard to the plaintiff's MU was to submit a consultation request for the plaintiff to see the corneal specialist, advise the plaintiff to continue with the plan of care established by MUSC, and

15

make sure the plaintiff had follow-up appointments.  The plaintiff was counseled on access to care and said he understood (*id.*).

On October 6, 2014, the plaintiff signed up for sick call requesting a refill on his medications.    Shortly thereafter, the plaintiff saw the ARNP, who renewed his medications (doc. 20-5, Negron decl. ¶ 62 ; doc. 20-6, med. rec. at 113-16; doc. 20-10, med. summ. at 9, 11, 12, 16, 18).  The plaintiff was again counseled on access to care, and stated that he understood (*id.*).

The plaintiff was transported to MUSC on October 14, 2014, to see the rheumatologist (doc. 20-5, Negron decl. ¶ 63; doc. 20-9, cons. rep. at 76-87).   The rheumatologist noted that all the previous lab results were negative for autoimmune disease.  He also noted the plaintiff reported a great improvement in pain, photosensitivity, and vision.  However, an examination now showed the right eye had a cloud as opposed to dark and smeared at his last visit.  The plaintiff denied any joint pain, rash, or skin changes, oral or nasal ulcerations, or gastrointestinal symptoms.  The plaintiff also reported he had puffiness in his ankles and his face.  After an examination of the plaintiff and a review of prior medical records from the corneal specialist, the rheumatologist agreed with the assessment that the plaintiff had PUK caused by a MU, but he was doing better since the surgery.  He discussed two different types of medications with the plaintiff to treat his condition:  oral prednisone and Methotrexate.  The plaintiff was given literature on the use of Methotrexate.  The rheumatologist recommended the plaintiff return in six weeks for a follow-up appointment (*id.*).

When the plaintiff returned to Estill, he was seen by medical staff (doc. 20-5, Negron decl. ¶ 64; doc. 20-6, med. rec. at 117-18).  He had no complaints and was not in pain or distress.  He was informed he would have a follow-up appointment with the rheumatologist in six weeks, and he was scheduled to see the corneal specialist the next day (*id.*).

On October 15, 2014, when the plaintiff was seen by the corneal specialist at MUSC, he stated he had a slight headache in the mornings, and the light still bothered him

some (doc. 20-5, Negron decl. ¶ 65; doc. 20-9, cons. rep. at 88-94).  He stated the ocular pain had been reduced, however his vision was still "opaque, like a plastic bag" (*id*.). Examination revealed that the MU was healing well.  The corneal specialist noted the plaintiff continued to have much less inflammation and should continue taking his current medications (*id*.).

Upon his return to Estill, the plaintiff was seen by medical staff (doc. 20-5, Negron decl. ¶ 66; doc. 20-6, med. rec. at 121-22).  He was not in any pain or distress. Medical staff noted that no paperwork from the specialist's office was sent with the escorting officers or the plaintiff in regard to the findings or recommendations by the corneal specialist.  The plaintiff was informed he would be seen for a follow-up appointment with a MLP the following day (*id*.).

On October 16, 2014, the plaintiff was seen by the ARNP in Health Services (doc. 20-5, Negron decl. ¶ 67; doc. 20-6, med. rec. at 123-25).  At that time, the plaintiff told the ARNP he had seen the rheumatologist on Tuesday and the eye doctor on Wednesday. He stated that both specialists wanted to start him on Methotrexate.  He indicated his sister had lupus and was taking this same drug.  An examination of the plaintiff showed he was steadily improving, there was no erythema to the site, and his semi-permanent contact remained in place, but he had a brownish hue to the sclera (*id*.).  The plaintiff's medications were renewed, and a consultation was requested for the plaintiff to see the rheumatologist for a follow up visit in six weeks (*id*.; doc. 20-7, cons. requ. at 039; doc. 20-10, med. summ. at 9-11).  Medical staff noted that office notes from the rheumatologist were received, but they were waiting on notes from the corneal specialist (doc. 20-5, Negron decl. ¶ 67; doc. 20-6, med. rec. at 123-25).  On this same day, Dr. Negron reviewed the rheumatologist's consult report and noted the ARNP had already prepared the consultation request to see this specialist again (doc. 20-5, Negron decl. ¶ 68; doc. 20-6, med. rec. at 126).

The plaintiff was seen by medical staff on October 30, 2014.  At that time, his vitals were taken, and he was not in acute distress.  Thereafter, the plaintiff was seen by the ARNP, who examined him and noted the semi-permanent contact was still in place.

The ARNP renewed the plaintiff's eye medications and requested a consult for the plaintiff to see the corneal specialist for a follow-up (doc. 20-5, Negron decl. ¶ 69; doc. 20-6, med. rec. at 127-32; doc. 20-10, med. summ. at 115-17). He also instructed the plaintiff to take all his medication bottles and drops to his next office visit with the specialist (*id.*). The plaintiff was counseled on access to care and stated he understood (*id.*). On this same date, the ARNP also submitted a consultation request for the plaintiff to see the corneal specialist for a follow-up (doc. 20-5, Negron decl. ¶ 69; doc. 20-7, cons. requ. at 41-42).

On November 7, 2014, the plaintiff was seen in sick call complaining of increased sensitivity to the right peripheral aspect of his right eye (doc. 20-5, Negron decl. ¶ 70; doc. 20-6, med. rec. at 133-34). He stated he has felt this sensitivity since February, but he had been told that this is where the "live tissue remained." He requested a refill of Maxitrol eye drops. Medical staff advised the plaintiff that he had an upcoming appointment with the corneal specialist and, at that time, he needed to notify the specialist of his increased sensitivity. Medical staff noted that this was presumably a normal expectation since native tissue remains in that area of the eye. The plaintiff's eye drops were changed to a different antibiotics drops (Moxifloxacin) and steroid drops (Prednisolone) by the consultant ophthalmologist during a prior appointment (*id.*). The plaintiff's other eye medications were renewed on November 14, 2014, and he was given a prescription for Ibuprofen 800 mg for pain (doc. 20-5, Negron decl. ¶ 70; doc. 20-10, med. summ. at 10, 12, 14).

On November 17, 2014, an administrative note in the plaintiff's medical record indicated that the ophthalmology consult report dated October 15, 2014, was reviewed (doc. 20-5, Negron decl. ¶ 71; doc. 20-6, med. rec. at 136). Staff noted the report indicated the plaintiff's MU was healing, he should continue on the same medications, and follow-up with the rheumatologist (*id.*)

On November 22, 2014, the plaintiff reported to sick call stating he thought his cornea transplant fell out (doc. 20-5, Negron decl. ¶ 72; doc. 20-6, med. rec. at 137-39). He claimed he was supposed to have a stitch removed around October 15, 2014, but that

18

had not been done yet.  He stated that when he woke up that morning he noticed his eye "felt different" and "something was moving."  He claimed that a white milky substance had developed and had been leaking out that morning.  Examination revealed the contact had moved and the eye appeared blood shot and swollen, and the plaintiff was not able to read the eye chart with his right eye.  The plaintiff stated his pain was better, but his vision was worse, and it just felt different.  The plaintiff was instructed to wear his eye patch.  Medical staff reviewed this information with the staff physician and were instructed to send the plaintiff to MUSC Emergency Room ("ER") (*id*.).

At the ER, the plaintiff reported that morning he had noticed a bubble and some possible drainage near his right iris (doc. 20-5, Negron decl. ¶ 73; doc. 20-9, cons. rep. at 95-99).  He denied any pain or change in vision.  An examination revealed no decreased vision, no discharge, no itching, no nausea, no redness, no swelling, no tearing, and no weakness.  His right contact lens appeared to be pushed up slightly off the eye.  He was assessed with discomfort to the right eye (*id*.).  The ER notes indicate the plaintiff was seen by the ophthalmology department, who found that the plaintiff did not have an acute need at that time, and he had an appointment with the corneal specialist the next week.  The plaintiff was discharged and returned back to Estill (*id*.).

On November 25, 2014, the plaintiff was transported to MUSC to see the corneal specialist (doc. 20-5, Negron decl. ¶ 74; doc. 20-9, cons. rep. at 100-11).  The plaintiff stated he was "more sensitive to the light" with some feeling of irritation that was worse in the mornings.  He reported he went to the ER over the weekend for "seepage" that was "yellowish."  He stated he was told the bandage lens was folded.  Examination revealed his cornea was intact, and there were a few loose sutures.  The contact lens and loose sutures were removed (*id*.).  The corneal specialist noted the ulceration had been halted, and a new large contact lens was placed in the plaintiff's eye which fit better  He was instructed to continue to use the recommended medications (*id*.).  The corneal specialist informed the plaintiff that he would consider tapering off the prednisone if the

rheumatologist agreed with this treatment. The plaintiff was scheduled for another follow-up on January 12, 2015 (*id*.).

The plaintiff was seen by medical staff when he returned to the institution (doc. 20-5, Negron decl. ¶ 75; doc. 20-6, med. rec. at 140-41). Medical staff noted the plaintiff did not have any prescriptions. He was instructed to go to sick call the next morning at 7:00 a.m. to follow up with the ARNP, and that he would go see the ophthalmologist again on January 15, 2015 (*id*.)

On November 26, 2014, medical staff noted in the plaintiff's medical record that the plaintiff was told to return to medical on that day, and he did not show up (doc. 20-5, Negron decl. ¶ 76; doc. 20-6, med. rec. at 142). Medical staff called the unit officer three times, and the officer told them he would have the plaintiff come to medical on the next move. The plaintiff did not show up. Medical staff then contacted the Lieutenant on duty and asked her to please tell the plaintiff he had to come to medical. The plaintiff had not shown up by 2:00, and the ARNP was notified (*id*.). At approximately 3:30 p.m., the plaintiff reported to Health Services and was seen by the ARNP (doc. 20-5, Negron decl. ¶ 76; doc. 20-6, med. rec. at 143-45). The plaintiff did not have any pain at this time (*id*.). A new consultation request was made for the plaintiff to return to the MUSC Storm Eye Institute for an ophthalmology follow-up visit (*id*.; doc. 20-7, cons. requ. at 42-43). The plaintiff was counseled on the importance of compliance with the treatment recommended by the corneal specialist, and he stated that he understood. (doc. 20-5, Negron decl. ¶ 76; doc. 20-6, med. rec. at 143-45]. The plaintiff was also advised he may return to medical as needed (*id*.).

The plaintiff was seen on December 11, 2014, by the ARNP (doc. 20-5, Negron decl. ¶ 77; doc. 20-6, med. rec. at 147-53). The plaintiff did not complain of any pain and reported that, on his most recent visit to the eye doctor, he got a new contact lens for his right eye (*id*.). At that time, a consultation request was submitted for the plaintiff's follow-up ophthalmology appointment (*id*.; doc. 20-10, med. summ. at 44-45).

On January 12, 2015, the plaintiff was transported to MUSC for a follow-up visit (doc. 20-5, Negron decl. ¶ 78; doc. 20-9, cons. rep. at 112-25). He was seen by an ophthalmologist who recommended immunosuppressors, taper prednisone, continue other current medications and follow-up in four to six weeks. The plaintiff received six new prescriptions from the ophthalmologist to be given to medical staff at the institution (*id*.). The next day, medical staff noted in the plaintiff's medical record that he was seen on June 12, 2015 (this should have read January 12, 2015) for his PUK and MU (doc. 20-5, Negron decl. ¶ 79; doc. 20-6, med. rec. at 154-56). Staff noted the ophthalmologist ordered six medications – one new medication and the other five medications previously prescribed for the plaintiff. These medications were filled, and two new consultation requests were added for the plaintiff to see the rheumatologist and ophthalmologist (*id*.; doc. 20-7, cons. requ. at 47-48;; doc. 20-10, med. summ. at 10, 12, 14-17).

On January 20, 2015, an administrative note in the plaintiff's medical record indicated that one of the medications (Hypromellose Opth Gel 0.3%) recently recommended by the specialist from the Storm Eye Institute, which was a non-formulary medication, was approved by the Central Office for the plaintiff (doc. 20-5, Negron decl. ¶ 80; doc. 20-6, med. rec. at 158).

On February 24, 2015, the plaintiff was transported to MUSC for a follow-up appointment with the ophthalmologist (doc. 20-5, Negron decl. ¶ 81; doc. 20-9, cons. rep. at 126-27). The ophthalmologist removed the sutures and replaced the large contact lens with a smaller contact. The ophthalmologist also recommended the plaintiff continue on the current medications and follow up with the rheumatologist again as soon as possible. It was noted that the plaintiff had some progressive superotemporal thinning in his right eye that had the PUK and MU (*id*.). On this same day, an administrative note in the plaintiff's medical record noted the paperwork from the ophthalmologist was brought to medical and placed on the ARNP's desk, but the plaintiff did not come to medical and instead went back to his housing unit (doc. 20-5, Negron decl. ¶ 82; doc. 20-6, med. rec. at 159). There were

no new prescriptions, but a follow-up appointment for the plaintiff to return to MUSC was made (*id*.).

On March 5, 2015, the plaintiff was seen at MUSC by the rheumatologist for a follow-up examination (doc. 20-5, Negron decl. ¶ 83; doc. 20- 9, cons. rep. at  127-39). The rheumatologist noted the plaintiff's history of illness and all the tests that had been done in order to determine his PUK and MU and the possible relation to autoimmune disease.   The plaintiff indicated he was experiencing side effects of the prednisone, including swelling, rash, and joint pain in ankles, knees, and shoulders.  He was assessed with PUK and MU, which requires further systematic immune suppression.  At that time, the rheumatologist recommended the plaintiff take Methotrexate and folic acid, and follow up with the ophthalmologist in four weeks to assess inflammation (*id*.).  The rheumatologist also recommended that the plaintiff be tapered off prednisone after a few weeks of Methotrexate therapy and ophthalmologist evaluation.  He also recommended the plaintiff return in about eight weeks for a follow-up appointment with him (*id*.).

The plaintiff was seen again by medical staff upon his return to Estill (doc. 20-5, Negron decl. ¶ 84; doc. 20-6, med. rec. at 160-64).  He did not voice any concerns and was not in pain.   Medical staff noted the two new medications recommended by the rheumatologist and ordered lab work for two weeks after starting Methotrexate and every eight weeks thereafter (*id*.).  Consultation requests were also ordered for the plaintiff to be seen by the ophthalmologist from Storm Eye Institute and the rheumatologist (*id*.; doc. 20-7, cons. requ. at 49-52).  The plaintiff received counseling on compliance with treatment, was advised to not remove eye shield, and no lifting, bending, or straining.  He stated that he understood (*id*.).

On March 16, 2015, the plaintiff was seen in Health Services for a follow-up. (doc. 20-5, Negron decl. ¶ 85; doc. 20-6, med. rec. at 164-69).  He requested more eye drops including Methotrexate and stated his eye was looking much better.  Examination revealed the plaintiff's right eye had tremendously improved, he continued to wear a lens in the eye, and the redness only circumvents an area in the inner aspect of the cornea (*id*.).

The plaintiff's medications were renewed, and he was prescribed the new recommended medications (*id.*; doc. 20-10, med. summ. at 10, 13-14, 16). Labs were again ordered (*id.*). The plaintiff was counseled on how to access medical care, and he stated he understood (*id.*).

The labs were taken on March 26, 2015, and were negative for any signs of autoimmune disorder (doc. 20-5, Negron decl. ¶ 86; doc. 20-12, lab test results at 9-10).

The plaintiff was seen on April 8, 2015, by the ophthalmologist, who recommended medication changes (doc. 20-5, Negron decl. ¶ 87; doc. 20- 9, cons. rep. at 140-47). The ophthalmologist noted that the plaintiff had a scheduled appointment at the end of April to see the rheumatologist, but did not mention a follow-up visit with their office (*id.*).

On April 10, 2015, medical staff made an administrative note in the plaintiff's medical record indicating he was recently seen at the eye clinic and his medications changed (doc. 20-5, Negron decl. ¶ 88; doc. 20-6, med. rec. at 170-71). Medical staff ordered the changes in the medications and a follow-up consultation with the ophthalmologist in six weeks or sooner (*id.*; doc. 20-7, cons. requ. at 53-54; doc. 20-10, med. summ. at 13).

The plaintiff saw the rheumatologist on April 28, 2015, at MUSC. The rheumatologist noted the plaintiff had begun taking Methotrexate and denied having any adverse side effects (doc. 20-5, Negron decl. ¶ 89; doc. 20-9, cons. rep. at 148-54). He noted the plaintiff's eye inflammation seemed better based on the last visit he had in March, and the plaintiff's shoulder pain was likely suggestive of a rotator cuff disease. He recommended an increase in the plaintiff's prescription for Methotrexate, lab tests, and follow-up with the ophthalmologist to assess inflammation (*id.*). The plaintiff was also seen by medical staff upon his return to Estill. The medical staff ordered the increase in Methotrexate and renewed his other medications as recommended by the rheumatologist (doc. 20-5, Negron decl. ¶ 90; doc. 20-6, med. rec. at 172-73). Medical staff submitted a

23

consultation request for the plaintiff to follow-up with the rheumatologist in six to eight weeks (*id*.; doc. 20-7, cons. requ. at 55-56).

On May 4, 2015, the plaintiff was seen by medical staff for his chronic medical conditions, including his PUK and MU in his right eye[8] (doc. 20-5, Negron decl. ¶ 91; doc. 20-6, med. rec. at 174-82). He did not complain of any pain or discomfort in his right eye. An examination revealed that the plaintiff's right eye continued to slowly improve with the Methotrexate (*id*.). The plaintiff's medications were renewed for his chronic conditions, and his prednisone prescription was reduced in order to taper him off this steroid. The plaintiff was counseled on how to access medical care, and he voiced he understood (*id*.).

On May 5, 2015, the plaintiff's prescription for his Methotrexate was increased (doc. 20-5, Negron decl. ¶ 92; doc. 20-10, med. summ. at 14). On May 8 and June 1, 2015, the plaintiff's other medications were renewed (doc. 20-5, Negron decl. ¶ 93; doc. 20-10, med. summ. at 9-11, 13-18).

On May 22, 2015, lab tests were ordered, and on June 15, 2015, the plaintiff had blood work done (doc. 20-5, Negron decl. ¶¶ 94-95; doc. 20-12, lab test results at 14-16). The laboratory results were negative for all the tests including ANA, ANCA, RF, CCP, and ESR (*id*.).

On June 30, 2015, the plaintiff was seen by the rheumatologist at MUSC for a follow-up visit (doc. 20-5, Negron decl. ¶ 97; doc. 20-9, cons. rep. at 155-56). The plaintiff was seen by medical staff at the institution upon his return (doc. 20-5, Negron decl. ¶ 97; doc. 20-6, med. rec. at 184-87). He was not in any pain and voiced no concerns. The plaintiff's medications were reconciled, and he was counseled on how to access care, which he stated he understood (*id*.)

The plaintiff was seen at the institution by the consultant optometrist on July 1, 2015 (doc. 20-5, Negron decl. ¶ 98; doc. 20-6, med. rec. at 190; doc. 20-9, cons. rep. at 157-58). The optometrist noted that the plaintiff had been diagnosed with an MU and had

---

[8] In this data entry, the medical record mistakenly indicates the plaintiff has PUK in both of his eyes (doc. 20-5, Negron decl. ¶ 91; doc. 20-6, med. rec. at 173-81).

a surgical procedure for this condition.  The plaintiff described his vision in his right eye as like looking through a plastic bag (*id.*).

On July 2, 2015, the plaintiff was seen for a follow-up appointment in Health Services (doc. 20-5, Negron decl. ¶ 99; doc. 20-6, med. rec. at 188-89).  He had no complaints and no pain.  An examination showed the plaintiff's right eye was much improved, and there was no redness noted.  The plaintiff was advised he had a follow-up appointment with the ophthalmologist scheduled, and he was counseled on how to access medical care, which he stated he understood (*id.*).

On July 16, 2015, the plaintiff was taken to MUSC for a follow-up appointment with the ophthalmologist (doc. 20-5, Negron decl. ¶ 100; doc. 20-9, cons. rep. at 159).  At this appointment, the ophthalmologist noted that extensive lab tests including ANA, ANCA, RF, CCP, and ESR were negative.  The plaintiff was assessed with a PUK and MU, and his medications were continued except for his prednisone, which was decreased (*id.*).  The plaintiff was seen by medical staff at Estill after his appointment (doc. 20-5, Negron decl. ¶ 101; doc. 20-6, med. rec. at 191-93).  He claimed the ophthalmologist told him to not take any more prednisone, but the paperwork from the ophthalmologist only showed that the plaintiff was to decrease taking it.  Medical staff advised the plaintiff to return in the morning to see the MLP and educated him on how to access care, which he said he understood (*id.*).

The plaintiff did not report to medical the following day as instructed (doc. 20-5, Negron decl. ¶ 102; doc. 20-6, med. rec. at 194-97).  He did not report back to the medical department until July 24, 2015, when he was seen by the MLP for a follow-up examination.  The plaintiff stated when he saw the eye doctor recently, he prescribed him Atarax for the itching that started when the plaintiff began taking Methotrexate.  He claimed his skin gets hot and he starts sweating and itching all over.  An examination showed the plaintiff's right eye was improving, and there was no redness noted.  The plaintiff's prednisone was decreased, he was given a medication for his itching, and two of his other medications were renewed.  Medical staff also requested approval from the Central Office

for Atarax, which was not on the National Formulary list (*id*.). He was also advised he would see the ophthalmologist again for a follow-up and was counseled on how to access care, which he agreed he understood (*id*.).

On August 14, 2015, an administrative note in the plaintiff's medical record indicated the Central Office did not approve the non-formulary request for Atarax (doc. 20-5, Negron decl. ¶ 103; doc. 20-6, med. rec. at 198-99]. Doxepin was substituted since it is used to stop itching (*id*.). Consultation requests for the plaintiff to see the rheumatologist and ophthalmologist were both submitted (*id*.; doc. 20-7, cons. requ. at 57-60). The requests note that the plaintiff should be scheduled to see the rheumatologist in four months and should see the ophthalmologist in April 2016 (*id*.).

Dr. Negron attests in his declaration that from May 13, 2013, until September 2, 2015, the plaintiff received medical treatment for his right eye corneal issue on approximately 106 occasions, including 29 times when he was treated by a specialist (doc. 20-5, Negron decl. ¶ 104). He further states that the chronology of the plaintiff's medical care shows that the BOP consistently adhered to its duty of reasonable care (*id*. ¶ 105). Dr. Negron attests that both he and the BOP's ophthalmologist reviewed the medical records upon the filing of the plaintiff's tort claim and concluded that the BOP provided effective care to the plaintiff with regard to his right eye issue (*id*. ¶ 106).

The plaintiff filed an administrative tort claim with the Southeast Regional Office ("SERO") on February 28, 2014 (doc. 20-3, admin. tort claim at 1). The plaintiff claimed medical staff at FCI Estill failed to provide him with adequate and timely medical treatment for an injury to his right cornea. He asserted that medical staff did not follow the advice of the consultant specialist and denied care due to the lack of concern for his condition. The plaintiff claimed that as a result of staff's negligence he experienced pain, suffering, and permanent damage to his right eye with the threat of losing his sight entirely. The plaintiff sought $400,000, in compensation for personal injury (*id.*)

On December 11, 2014, the SERO mailed a final determination letter to the plaintiff (doc. 20-4, resp. to admin tort claim). The determination letter informed the plaintiff

26

that an investigation did not indicate that he had sustained any injury caused by any negligent or wrongful act or omission of any BOP employee acting within the scope of his or her employment.  The determination letter outlined the chronology of the plaintiff's medical care, as described above.  The letter informed the plaintiff there was no evidence of apathy toward him by staff who provided treatment for the condition associated with his right eye (*id.*).  Additionally all laboratory testing and follow-up appointments recommended by the treating specialists were performed in a timely manner by FCI Estill medical staff.  The letter informed the plaintiff that his claim was denied and that, if dissatisfied with the decision, he could file suit in the appropriate United States District Court within six months of the date of the letter (*id.*).  The plaintiff filed the instant lawsuit within that time frame on May 26, 2015 (doc. 1, comp.).

In his complaint, the plaintiff alleges that the defendant BOP "negligently and continuously failed to provide proper and reasonable care in the diagnosing and treatment of an acute affliction attacking his ocular facilities" (doc. 1, comp. at 1).  He contends that, as a result of such negligence, he has suffered diminished usage of his right eye and vision and required surgical procedures to salvage and preserve his eye, to include invasive surgery and transplants (*id.*).  He asserts that he has suffered physical and mental pain and future medical needs that will exist throughout his lifetime (*id.*).  He demands judgment against the defendant for $4,469,000 (*id.* at 2).

## APPLICABLE LAW AND ANALYSIS

### Standard of Review

As matters outside the pleadings have been presented to and not excluded by the court, the defendant's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) must be treated as one for summary judgment under Rule 56.  Fed. R. Civ. P. 12(d).  Rule 56 states, as to a party who has moved for summary judgment:  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  As to the first of these determinations, a fact is deemed "material" if proof of its

existence or nonexistence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257.  In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).  Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings; rather, he must demonstrate that specific, material facts exist that give rise to a genuine issue. *Id.* at 324.  Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252.  Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion.  *Id.* at 248.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

### FTCA

The plaintiff brings this action alleging negligence of federal employees while acting within the scope of their office; therefore, the FTCA is controlling. *See* 28 U.S.C. § 2671 *et seq.* In FTCA actions, a remedy against the United States is exclusive of any other civil action or proceeding for money damages against the employee whose act or omission gave rise to the claim. *Id.* § 2679(b)(1).  The plaintiff names the BOP as the defendant in the complaint.  As argued by the defendant, a suit under the FTCA lies only against the United States*. See Sheridan v. Reidell*, 465 F. Supp. 2d 528, 531 (D.S.C. 2006). Accordingly, the only proper defendant is the United States of America, and, thus, it should be substituted as the defendant and the BOP should be dismissed.

The defendant concedes that the plaintiff has met the FTCA exhaustion requirement as set forth in 28 C.F.R. § 14.1 *et seq.* (doc. 20 at 3-5).

The FTCA, provides for a limited waiver of the Government's sovereign immunity from suit by allowing a plaintiff to recover damages in a civil action for loss of property or personal injuries caused by the "negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1).  Because the FTCA includes a limited waiver of the Government's immunity as a sovereign, the statute is to be strictly construed and its requirements strictly met. *See Welch v. United States*, 409 F.3d 646, 650–51 (4th Cir.2005); *see also Lane v. Pena*, 518 U.S. 187, 192 (1996) (stating that "a waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign").

As stated above, the court must determine liability in accordance with the substantive tort law of the state "where the act or omission occurred." 28 U.S.C. § 1346(b)(1); *see also Medina v. United States*, 259 F.3d 220, 223 (4th Cir.2001) (holding that the FTCA "permits the United States to be held liable in tort in the same respect as a private person would be held liable under the law of the place where the act occurred"). Because the plaintiff alleges negligence associated with medical treatment at a federal prison located in South Carolina, the substantive law of South Carolina controls.

To recover in a negligence claim under South Carolina law, "a plaintiff must prove the following three elements; (1)  a duty of care owed by defendant to plaintiff; (2) breach of that duty by a negligent act or omission; and (3)  damage proximately resulting from the breach of duty." *Bloom v. Ravoira*, 529 S.E.2d 710, 712 (S.C.2000).  Further, when a complaint involves medical malpractice, the South Carolina Supreme Court requires a plaintiff to show; "(1) the generally recognized and accepted practices and procedures that would be followed by average, competent practitioners in the defendant['s] field of medicine under the same or similar circumstances, and (2)  that the defendant[ ] departed from the

29

recognized and generally accepted standards." *David v. McLeod Reg'l Med. Ctr.*, 626 S.E.2d 1, 4 (S.C. 2006). A plaintiff must also "show that the defendant['s] departure from such generally recognized practices and procedures was the proximate cause of the plaintiffs alleged injuries and damages." *Id*. Moreover, to pursue a medical malpractice claim under South Carolina law, a plaintiff must file "as part of the complaint an affidavit of an expert witness which must specify at least one negligent act or omission claimed to exist and the factual basis for each claim . . . ." S.C. Code Ann. § 15–36–100(B). "[F]ailure to file such an affidavit with the Complaint requires dismissal of the case in state court." *Allen v. United States*, C.A. No. 2:13–2740–RMG, 2015 WL 1517510, at *6 (D.S.C., Apr.1, 2015) (citing *Rotureau v. Chaplin*, C.A. No. 2:09–1388–DCN, 2009 WL 5195968, at *6 (D.S.C., Dec. 21, 2009)). The affidavit requirement is part of the substantive law of medical malpractice in South Carolina and is not procedural. *E.g., Rotureau*, 2009 WL 5195968, at *6.

The defendant first argues that the plaintiff's complaint must be dismissed because he failed to file an expert affidavit contemporaneously with his complaint as required by South Carolina statutory law. *See* S.C. Code Ann. § 15–36–100(B). The undersigned agrees. *See Cook v. U.S.*, C.A. No. 0:14-1169-RMG, 2015 WL 2160098, at *3 (D.S.C. May 7, 2015) (dismissing prisoner's FTCA claim because he did not file an expert affidavit with the complaint as required in order to pursue a malpractice claim in South Carolina); *Burris v. U.S.*, C.A. No. 2:14-430-MGL-WWD, 2014 WL 6388497, at *2 (D.S.C. Nov. 14, 2014) (same); *Chappie v. U.S.*, C.A. No. 8:13-1790-RMG, 2014 WL 3615384, at *1 (D.S.C. July 21, 2014) (same).

In his response in opposition to the defendant's motion, the plaintiff acknowledges that the "toughest challenge thus far facing [him] is the lack of an affidavit from a qualified medical expert to support his contentions and his case" (doc. 30 at 2). He argues that the court should not require him to provide such an affidavit because he is a *pro se* litigant and is incarcerated. He further contends that his status "prohibits unauthorized contact with individuals outside of the institution," his eye issue is rare, the individuals best

30

able to provide an affidavit are the specialists who are treating him, and any attempt on his behalf to contact his specialists would subject him to disciplinary action (*id.* at 6-7).

As argued by the defendant, the plaintiff is no different than any other federal inmate in South Carolina who files an FTCA lawsuit against the United States, and, as set forth above, the affidavit requirement is regularly enforced by this court (doc. 32 at 4). Further, along with its reply brief, the defendant has submitted the declaration of Tami Cassaro, a Supervisory Attorney for the BOP, who states that there is no BOP policy that explicitly prohibits an inmate from contacting an outside specialist to obtain an affidavit to support a lawsuit. Further, there have been other instances where inmates have brought FTCA actions in this court with affidavits from their treating specialists, and the inmates were not disciplined (doc. 32-1, Cassaro decl. ¶ 6).

Even assuming that the plaintiff did not need an affidavit from an expert in order to file this lawsuit as required by the statute discussed above, he is incapable of establishing medical malpractice without expert testimony. *See Pederson v. Gould*, 341 S.E.2d 633, 634 (S.C.1986) (citation omitted). "In medical malpractice actions, the plaintiff must use expert testimony to establish both the required standard of care and the defendant's failure to conform to that standard, unless the subject matter lies within the ambit of common knowledge and experience, so that no special learning is needed to evaluate the conduct of the defendant." *Id*. Here, the subject matter is not one that can be evaluated based on common knowledge and experience, as acknowledged by the plaintiff (*see* doc. 30 at 6-7 (describing the "rarity" of his condition)). The Court agrees and the defendant concedes that the defendant owed the plaintiff a duty under 18 U.S.C. § 4042 to provide adequate medical care. The court finds, however, that the plaintiff has failed to demonstrate negligence or malpractice by any prison officials, and therefore by the United States. Besides his own conclusory statements about what is reasonable and adequate, the plaintiff has failed to demonstrate what the appropriate standard for medical care is and has failed to show any deviation from the standard of care. The plaintiff's medical records summarized above demonstrate that he received regular evaluations by medical staff and

31

specialists, emergency room treatment, laboratory tests, surgery and post-surgical care, and numerous prescriptions for treatment of his right eye.  Further, the plaintiff has failed to show how any alleged departure from the required standard of care proximately caused his injuries.  Accordingly, the plaintiff's FTCA malpractice claim cannot survive summary judgment.

## CONCLUSION AND RECOMMENDATION

Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the defendant's motion for summary judgment (doc. 20) be granted.  The attention of the parties is directed to the notice on the next page.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

July 27, 2016
Greenville, South Carolina

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
300 East Washington Street
Greenville, South Carolina 29601

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).